J-S27030-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| KENNETH FIELDS | |
| Appellant | No. 1926 EDA 2014 |

Appeal from the Judgment of Sentence entered June 25, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0011614-2012

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY STABILE, J.:                          **FILED JULY 28, 2015**

Appellant Kenneth Fields appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County (trial court), after Appellant was convicted of possession with intent to deliver a controlled substance (PWID), intentional possession of a controlled substance, and evidence tampering.[1]  Upon review, we vacate and remand.

The facts underlying this case are undisputed.  As summarized by the trial court:

> On the evening of August 28, 2012, a gunman shot a victim near the intersection of 52nd Street and Girard Avenue in a high-crime area of Southwest Philadelphia.  Fortunately, a surveillance camera captured video of the gunman as he committed the shooting.  From this video, authorities extracted

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30), (16), and 18 Pa.C.S.A. § 4910(1).

several low-resolution photographs of the gunman, disseminated those photographs to certain police officers, and instructed those officers to search and patrol the intersection and its general vicinity.

Uniformed Philadelphia Police Officer Darnell Jessie and his partner searched and patrolled the area on August 31, 2012 at approximately 12:40 a.m. and observed as [Appellant] walked through a dark field near the intersection where the shooting occurred. Believing that [Appellant] resembled the gunman in the photograph, Officer Jessie and his partner approached [Appellant] and requested his identification.

After [Appellant] produced his identification, Officer Jessie and his partner returned to their vehicle to determine whether authorities had issued any arrest warrant for [Appellant]. While he stood at the vehicle, Officer Jessie observed that [Appellant] "was trying to reach his hands back into his pocket." This sudden movement alarmed Officer Jessie because [Appellant] already retrieved his identification from his pocket. Fearing that [Appellant] may retrieve a firearm, Officer Jessie approached [Appellant] and initiated a brief "safety pat frisk" of [Appellant's] outer garments.

Upon commencing the frisk, Officer Jessie felt objects in the pocket of [Appellant's] outer garment and immediately recognized that the objects were consistent with the feel and texture of packaged crack cocaine. Officer Jessie testified that his familiarity with this type of packaging was based upon his prior participation in numerous arrests of persons in possession of similarly packaged crack cocaine. However, Officer Jessie did not have the opportunity to conduct a thorough investigation: immediately after Officer Jessie felt the packaged crack cocaine, [Appellant] fled on foot.

During the ensuing pursuit, Officer Jessie never lost sight of [Appellant]. He observed as [Appellant] crossed 52nd Street and Girard Avenue, stopped at a sewer grate, reached into his pocket, retrieved "some items" from the pocket, and threw those items into the sewer. Immediately thereafter, [Appellant] raised his hands and lay on the ground. [Appellant] volunteered that he fled because he was on probation and had "weed" in his possession. Officer Jessie then arrested [Appellant].

After placing [Appellant] in handcuffs, Officer Jessie returned to the sewer where he had observed [Appellant] discarding his items. When he peered into the sewer, Officer Jessie saw a clear plastic bag that contained several packets of crack cocaine. Officer Jessie retrieved the plastic bag and its contents, and he placed the packaged crack cocaine on a property receipt.

Trial Court Opinion, 10/2/14, at 2-3. Thereafter, Appellant was charged with PWID, intentional possession of a controlled substance, and evidence tampering in connection with his possession of crack cocaine. Appellant filed a motion to suppress the seized crack cocaine. Following a hearing, the trial court denied Appellant's suppression motion on March 21, 2014.

On April 25, 2014, the trial court found Appellant guilty of the charged offenses and on June 25, 2014, the trial court sentenced Appellant to 11½ to 23 months' imprisonment, followed by five years of reporting probation. Appellant timely appealed to this Court. Upon the trial court's direction, Appellant filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, arguing only that the trial court erred in denying his motion to suppress. In response, the trial court issued a Pa.R.A.P. 1925(a) opinion, concluding it did not err in denying Appellant's suppression motion.

On appeal, Appellant raises five issues for our review:

I. Whether Appellant's interactions with police rose from a mere encounter to an investigatory detention when [p]olice retained Appellant's identification for the purpose of a warrant search?

II. Whether there was a reasonable suspicion to stop [A]ppellant based on alleged resemblance to a suspected shooter?

III. Whether Appellant's furtive movements alone supported a finding of reasonable suspicion to frisk for weapons?

IV. Whether the search of Appellant went beyond the bounds of a frisk for weapons?

V. Whether any contraband recovered by police[] was the product of forced abandonment, and was the fruit of a seizure, not supported by probable cause, and should be suppressed?

Appellant's Brief at 3.

In reviewing appeals from an order denying suppression, our standard of review is limited to determining

> whether [the trial court's] factual findings are supported by the record and whether [its] legal conclusions drawn from those facts are correct. When reviewing the rulings of a [trial] court, the appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the [trial] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Griffin*, 2015 PA Super 117, __ A.3d __, 2015 WL 2193891, at *2 (filed May 12, 2015). Our scope of review is limited to the evidence presented at the suppression hearing. *In the interest of L.J.*, 79 A.3d 1073, 1088-89 (Pa. 2013).

Appellant first argues the trial court erred in concluding that his interaction with Officer Jessie escalated from mere encounter to investigatory detention when Officer Jessie took Appellant's identification to the police cruiser for purposes of checking for outstanding warrants. We agree.

Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution protect the people from unreasonable searches and seizures. *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (citation omitted). The *Lyles* Court explained:

> Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop and respond. The second, an "investigatory detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.

> In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. . . . The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and [our Supreme] Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.
>
> [Our Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification or question an individual so long as the officers do not convey a message that compliance with their requests is required. Although police may request a person's identification, such individual still maintains the right to ignore the police and go about his business.

*Id.* at 302-03 (internal citations and quotation marks omitted). The Court further explained that "a request for identification does not *in and of itself* elevate what would otherwise be a mere encounter into an investigative detention." *Id.* at 304 (emphasis in original). Despite this general principle, however, "an encounter involving a request could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the officer's mere employment, conveying a demand for compliance or that there will be tangible consequences from a refusal." *Id.* A mere encounter escalates to investigatory detention when a police officer takes and maintains possession of an individual's identification card to check whether the individual has any outstanding warrants. *Commonwealth v. Hudson*, 995 A.2d 1253, 1258-

59 (Pa. Super. 2010); *see also Lyles*, 97 A.3d at 306 (noting that the police officer's interaction with appellant did not rise to investigatory detention where "[t]he officer did not question appellant further while he was holding the identification, and **he did not use appellant's information to run a background check**") (emphasis added).

In **Hudson**, a police officer observed appellant outside of a corner grocery store with an adult male. The officer drove past the store several times over the course of an hour and saw appellant go inside the store whenever appellant noticed the police cruiser. On his third drive-by, the officer approached appellant as he was walking down a street with another man. Following a brief conversion, the officer asked the two men whether they had identification. They did. Appellant and his male companion provided their Pennsylvania identification cards. Upon receipt, the officer took their identification cards to the police cruiser to run a warrant and scofflaw check. Ultimately, it turned out that appellant had a scofflaw warrant for a summary harassment charge. The officer arrested appellant and, incident to the arrest, searched appellant's person and discovered drugs and cash.

Based on these facts, the **Hudson** Court concluded the officer "effectuated an investigative detention at the time that [the officer] took and maintained possession of [appellant's] identification." 995 A.2d at 1259. The **Hudson** Court also concluded that the officer did not have reasonable suspicion to detain appellant for investigation because the officer at best

"observed [appellant] meeting with three men and walking into and out of a grocery store, all of which are lawful activities." **Id.** Accordingly, the **Hudson** Court held that the officer's investigative detention of appellant was constitutionally infirm and, as a result, overruled the trial court's denial of appellant's motion to suppress the seized evidence. In so doing, this Court, *inter alia*, vacated appellant's judgment of sentence.

In light of **Hudson**, we are constrained to agree with Appellant that his interaction with the police escalated to an investigative detention when Officer Jessie took Appellant's identification to the police cruiser to search for outstanding warrants. At the suppression hearing, Officer Jessie testified, "I then took that [identification] from [Appellant], walked back to the patrol vehicle to give my partner [the identification] to see if there are no outstanding warrants." N.T. Suppression, 3/21/14, at 11. Accordingly, the trial court erred in concluding that Appellant's interaction with the police amounted to a mere encounter.

Our inquiry, however, does not terminate here. Because the police detained Appellant for investigatory purposes, we must determine whether the police had reasonable suspicion for so doing. It is settled that reasonable suspicion necessary for investigative detentions

> is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Commonwealth v. Davis*, 102 A.3d 996, 1000 (Pa. Super. 2014) (citations omitted). "In order to justify an investigative detention, the police must have reasonable suspicion that criminal activity is afoot. Reasonable suspicion must be based on specific and articulable facts, and it must be assessed based upon the totality of the circumstances viewed through the eyes of a trained police officer." *Commonwealth v. Williams*, 980 A.2d 667, 672 (Pa. Super. 2009) (citation omitted), *appeal denied*, 990 A.2d 730 (Pa. 2010). Thus, "[t]he determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an *objective* one, which must be considered in light of the totality of the circumstances." *Commonwealth v. Holmes*, 14 A.3d 89, 96 (Pa. 2011) (emphasis added). In assessing the totality of the circumstances, a court must give weight to the inferences that a police officer may draw through training and experience. *Id.* at 95.

In the case *sub judice*, the facts from the suppression hearing indicate that the police were searching for a gunman who shot someone near the intersection of 52nd Street and Girard Avenue, a high-crime neighborhood, in Southwest Philadelphia on August 28, 2012. Officer Jessie and his partner were provided a low-resolution picture of the gunman taken from a surveillance video. N.T. Suppression, 3/21/14, at 8-9. Officer Jessie testified that, on August 31, 2012, at 12:40 a.m., three days later, in the dark of the night, he spotted Appellant walking through an unlit field, one block from the site of the shooting. *Id.* at 8-9. Officer Jessie further

testified that, believing Appellant resembled the gunman, he approached Appellant to investigate. *Id.* at 10. On cross-examination, however, Officer Jessie acknowledged that, at the time of arrest, Appellant had "serious male-pattern balding" and "a very short mustache" and the gunman in the low-resolution picture had a "full set of hair" and "a large beard." *Id.* at 16-18. Thus, given the totality of the circumstances here, we cannot conclude Officer Jessie objectively had reasonable suspicion to detain Appellant for purposes of investigating the shooting. Officer Jessie's belief that Appellant resembled the person in the low-resolution photo was not reasonable. Accordingly, we conclude the trial court erred in denying Appellant's motion to suppress the crack cocaine. We vacate Appellant's judgment of sentence and remand the matter to the trial court for further proceedings, including a new trial or discharge of Appellant.[2]

Judgment of sentence vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/28/2015

---

[2] Based on the outcome of this case, we need not address Appellant's remaining arguments.